JOHN M. MURDOCH, STATE'S ATTORNEY (HAINES, STATE'S ATTORNEY, SUBSTITUTE PLAINTIFF), *vs.* GEORGE E. EL-LIOT ET AL.

Third Judicial District, New Haven, June Term, 1904.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, JS.

The question whether trustees appointed by deed or will shall be removed for neglect of duty or breach of trust, is one addressed to the sound discretion of the trial court, whose determination must depend largely upon the circumstances of the particular case. If the trustees have acted honestly and in good faith they are not necessarily to be removed because the trust fund has sustained losses through their investments, and because the method, or lack of method, of keeping their accounts was, until shortly before the suit for their removal was brought, decidedly unbusinesslike and exceedingly careless.

The facts in the present case reviewed and the action of the trial court in refusing to remove the defendant trustees upheld as a proper exercise of its discretion.

Argued June 22d—decided August 12th, 1904.

ACTION to secure an accounting of the funds of the Morgan School of Clinton and the removal of the trustees, and for other relief, brought to the Superior Court in Middlesex County and transferred by stipulation of the parties to the Superior Court in New Haven County and referred to a committee (Henry C. White, Esq.) who heard and reported the facts ; the court, *Shumway, J.,* accepted the committee's report, overruling a remonstrance thereto, and rendered judgment for the defendants, from which the plaintiff appealed. *No error.*

*Charles E. Perkins* and *Seymour C. Loomis,* with whom was *Earnest C. Simpson,* for the appellant (plaintiff).

*Lynde Harrison* and *Edmund Zacher,* for the appellees (defendants).

TORRANCE, C. J. The complaint in this case charges the trustees of the Morgan School fund with maladminis-

tration and impairment of the trust fund, and prays for an accounting, the removal of the trustees, and the repayment by them of any money for which they may be found liable upon such accounting. The defendants denied the charges, and the case was heard by a committee. Against the acceptance of the report of the committee the plaintiff remonstrated, but the court overruled the remonstrance and accepted the report.

It appears from the report that Charles Morgan began in 1870 to establish and endow a school in the town of Clinton in this State, and by a series of gifts, set forth in certain exhibits made a part of the report, conveyed the school property and an endowment fund to certain trustees of his own selection. The original trustees were John D. Leffingwell, Alfred Hull, Andrew J. Hurd and George E. Elliot. Hull died in 1877 and was succeeded by Elisha R. Redfield. Leffingwell died in 1886 and was succeeded by Charles A. Elliot; and in 1897 Redfield was succeeded by James M. Wellman. In October, 1870, Morgan conveyed to the original trustees the land in Clinton upon which the school buildings were subsequently erected, to be held by them and "their heirs and successors forever, in trust upon and for the uses, trusts, and purposes" expressed in the deed. The deed described the trust and the powers of the trustees, and provided for the perpetuation of the board of trustees in the following words : "To take, hold, and exclusively possess and manage the same and the said building or schoolhouse to be completed thereon, and all property connected therewith or appertaining thereto, and the school or schools of whatever grade or order that may from time to time or at any time be established or continued therein or upon said premises, all for the use and benefit of the said town of Clinton, and the improvement of the moral and educational condition and interests of the people thereof, and the organization, duration, regulation, and conduct of such school or schools shall at all times be under the exclusive management, direction, and control of said trustees, or their successors. Whenever a vacancy or vacancies shall occur in the said

board of trustees by death, resignation, removal from said town, inability to serve as such, or otherwise, the survivors as remaining trustees are hereby authorized, empowered, and directed so soon as may be and at a meeting to be held in said town for that purpose, which all shall have reasonable notice to attend, to proceed to fill such vacancy or vacancies, and the person or persons so elected shall thereupon succeed to and be invested with all the right, title, and interest in and to said trust estate and property, and all rights, powers, and duties touching the same, and the management, direction, and government of said school, that his predecessors or either of the trustees herein particularly named at any time possessed. But no person who is not a resident of said town of Clinton shall ever be elected to or hold the office or place of such trustee."

Upon this land Mr. Morgan caused to be erected a school building which he furnished and completed ready for use as a school; the whole representing an expenditure of $70,000. In addition to this, at divers times between 1870 and 1878, he gave to said trustees, in trust for substantially the same purposes as are in the aforesaid deed expressed, as an endowment fund for said school, the sum of $200,000. He also, in 1874, gave to said trustees the sum of $5,000 as a fund to be known as the "Morgan Prize Fund," the income of which was to be used for providing prizes for scholars in said school. About the year 1871 a high school and common schools were by the trustees established in the school building erected by Mr. Morgan, and such have ever since been continuously maintained.

The specific charges made in the complaint against the trustees are in substance the following: (1) that one of them, George E. Elliot, with the knowledge of the others, took from the trust fund $7,000 and converted it to his own use; (2) that the "Morgan Prize Fund" has been wasted, lost or greatly impaired by the misconduct of the trustees; (3) that there has been a large loss of both principal and income upon the reinvestment of the trust fund secured by bond and mortgage upon real estate in the cities of New

York and Brooklyn; (4) that the trustees have persistently refused to render any account to the town of Clinton, or to any of its officers, and have never rendered any account to any court of this State; (5) that there is great danger that the trust funds will be further wasted or impaired, and that the trustees are unfit to have the management of said trust funds.

With reference to the first of these charges the finding of the committee is as follows : " This $7,000 was drawn from the trust fund with the consent of all of the defendants, and was used to pay a debt due from the said Elliot to the Clinton National Bank, of which bank said Leffingwell, one of the defendant trustees, was president. . . . On February 10th, 1884, the said Elliot gave to said trustees his mortgage deed to secure the payment of said $7,000. Said deed conveyed a tract of land in said Clinton, with the dwelling-house and other buildings thereon, containing about one acre, and also a certain tract of outlying land containing about thirty acres, of which about eighteen acres were woodland. The evidence indicated, and it is found, that the value of the property given as security was somewhat greater than the amount of the loan. The mortgage deed represented the title free from incumbrance, and contained the usual covenant of warranty. The condition of the title did not clearly appear from the evidence. It did, however, appear that two brothers of said Elliot quitclaimed to him on June 26th, 1897, such interest as they had in the mortgaged property. About November 1st, 1899, George W. Quintard, son-in-law of said Morgan, purchased the said Elliot mortgage from the trustees, and paid to them therefor $7,000." Concerning the payment of interest on this mortgage, the finding is in substance as follows : No money was paid by Elliot to the trustees for interest, but it was paid by deductions from Elliot's salary as treasurer of the trust funds. No entries of such interest were made on the cash book at the time when such payments should have been made; but " entries for such interest payments and for salary drawn, corresponding in amount to such payments, were entered subsequently to

the time when such salary might have been drawn, the said entries for salary being either interlined or entered at the head of the respective pages of the cash book on which they appear."

With reference to the charge concerning the "Morgan Prize Fund" the finding, in substance, is as follows : Said fund was originally invested in a United States bond which was paid in October, 1881. Then it was invested in five bonds of the Texas Central Railroad Company of $1,000 each, bearing seven per cent interest. "In 1885 these bonds defaulted their interest and were surrendered, and in place thereof the trustees received, on the reorganization of the company which issued the bonds, twenty-five shares of its preferred stock and fifty of its common stock, and these stocks they still hold. No income was received from this investment from the time when the interest on the bonds was defaulted in 1885 until 1896, when the first dividend on the preferred stock was paid. Before purchasing the Texas Central bonds the trustees consulted Mr. Rintoul, the clerk and executor of Mr. Morgan, and also took the advice of John J. Cisco, a New York banker, who was a director in one of the corporations in which the said Morgan had been interested, and by the said Rintoul and the said Cisco the trustees were advised that these bonds were amply secured and were a safe investment. The committee finds that the trustees exercised reasonable prudence and good faith in the purchase of these bonds, and in accepting and holding the stocks given in place thereof at the reorganization, and the trustees are therefore credited with $5,224.66."

The finding in effect negatives the third specific charge, that a large loss of income and principal had resulted from mortgages of real estate in New York and Brooklyn.

With reference to the charge that the trustees have ever refused to render any account to the town or to the courts, the finding is as follows : "From time to time some of the citizens and taxpayers of the town of Clinton called on the trustees to render an account showing the condition of the trust fund and its income. The trustees took legal ad-

vice as to their duty, and were told that they were under no obligation to account to any one beside the said Morgan and his representatives, unless requested to do so by the State's Attorney. No demand for an accounting was made on them by the State's Attorney prior to the beginning of this action. Neither the said Morgan nor any of his heirs or representatives ever called on the trustees for an account prior to the time when the Tate account was prepared. . Some time in the year 1896 George W. Quintard, the son-in-law of said Morgan, at the suggestion of some of the citizens and taxpayers of Clinton, requested D. C. Tate, a certified public accountant of the State of New York, to prepare an account for the said trustees. The said Tate had had long experience as an accountant, and was competent and trustworthy. With the aid of his assistant, Ira C. Bellows, who was also an experienced, trustworthy and competent accountant, the said Tate prepared the statement hereinbefore referred to, filed in this action February 1st, 1899. This account was not prepared from the books of the trustees, but from vouchers submitted by George E. Elliot, one of said trustees, and their treasurer. Where these vouchers were incomplete they were supplemented by checks, check stubs, statements from S. F. Cowdrey, a financial agent of the trustees, and other written memoranda prepared by the said Elliot. After the conclusion of the said Tate account the said Bellows examined the cash book of the trustees, and made certain corrections in said Tate account, and stated the account from the beginning of the trust to January 1st, 1897. The original Tate account was examined by the plaintiff's expert accountant, and compared with said cash book, the books of said Cowdrey, certain public records, and other evidence tending to test its accuracy. The plaintiff's criticisms of the Tate account were examined and considered by the said Tate and Bellows, and, so far as accepted, were adopted by them in making their corrections of the original Tate account. The substance of the corrected account of the said Tate and Bellows, with certain modifications, is incorporated in this report."

The committee has found that the total principal fund for which the trustees are accountable is $276,743.05 ; while the income received by them, from the beginning of the trust down to January 1st, 1897, is found to be "approximately" $270,140.58 ; "so that the trustees are charged with principal and income to the amount of $546,883.63." The credits to the trustees for investments are found to be $271,481.66 ; while the credits for income disbursements are found to be "approximately" $272,323.96 ; making the total credits $543,805.62, and thus leaving a balance of $3,078.01 against the defendants.

The committee has found "that except for the losses in connection with the Cisco failure, the default on the Texas Central bonds, and the Cowdrey failure (which occurred after January 1st, 1897), there has been no serious impairment of the principal fund ; that the income received by the trustees was substantially as stated in this report ; and that, except for the losses hereinbefore mentioned, said income has been applied for the proper support of the said school and the improvement of the school property."

Concerning the loss on Texas Central bonds the finding is as hereinbefore stated..

Concerning the loss resulting from the failure of Cisco & Son, the finding is as follows : "For some years prior to January 1st, 1885, the said trustees kept an account with John J. Cisco & Son, bankers, in the city of New York. On or about said January 1st the said Cisco & Son failed, being indebted to the said trustees for a balance of account to the amount of $1,778.82. After deducting the dividends received by the trustees from the insolvent estate, there remained a loss of $1,028 to the trust by reason of said failure. The committee finds that in opening and continuing the account with said Cisco & Son said trustees acted with reasonable business judgment, and in good faith. Part of the balance against the trustees is explained by this loss."

Concerning the loss from the Cowdrey failure, the following is the finding : "S. F. Cowdrey, a lawyer and real-estate agent in New York, was employed by the trustees, with the

said Morgan's knowledge and approval. The said Cowdrey was also employed by other persons in the vicinity of Clinton for the investment of trust funds and other property, and up to the time of his death on October 31st, 1896, bore a good reputation. His sons, who had been associated with him in business, continued to act as the agents of the trustees after the father's death. In May, 1897, the trustees discovered that the sons of Cowdrey had misappropriated some of the trustees' funds, had permitted real estate taken by the trustees on foreclosure to be sold for taxes, and had in other ways mismanaged the property of the trustees left in their care. These discoveries led to the failure of the said Cowdreys; and at the time of the failure they were indebted to the trustees to the amount of $5,754.11. Dividends from the insolvent Cowdrey estate to the amount of $1,300 were received, leaving the net loss to the trust by reason of the Cowdrey failure $4,454.11."

The committee has also found the following facts: "The only account kept by the trustees was a cash account, which was not balanced between 1880 and January 1st, 1897. Certain accounts relating to the principal fund and particular investments were opened, but were discontinued. Many of the entries relating to the fund sent to the said Cowdrey for investment were entries of net income received from the said Cowdrey. Numerous entries on said cash book were in pencil, and some were not made at the time of the transactions to which they refer. In January, 1897, the trustees opened a new set of books, consisting of a cash book, journal, and ledger, in accordance with a plan prepared by the said D. C. Tate. The new books were not introduced in evidence, and no question was raised as to the sufficiency of the said books. It did not appear whether the plan of said Tate provided for stated accounting by the trustees. The committee finds that by reason of the informal and incomplete book accounts kept by the trustees prior to January 1st, 1897, and the nature of the vouchers submitted by them in their accounting, and the lack of any further evidence on which an account could be based, no wholly accurate ac-

count either of the income or principal of the fund prior to said January 1st, 1897, can now be stated."

· The foregoing statement contains the substance of the committee's report touching matters which have any material bearing upon the questions involved in this case.

To the acceptance of this report the plaintiff filed a remonstrance, in which he set up certain matters of fact and asked that the report be sent back for a further finding of facts. Among the matters set out in the remonstrance was the fact that the amount of income received and disbursed by the trustees was only stated " approximately " ; and the court held that this was " the only reason worthy of serious consideration for recommitting the report."

We think the court was right in so holding. But as to this reason, the committee has found, in effect, that the account stated by him is substantially a correct account, and that it is practically impossible upon any further hearing to state it more accurately. The court overruled the remonstrance and accepted the report, and we think it did not err in so doing. We think the report fails to show any liability of the trustees for any losses found to have occurred to the trust fund, and also fails to show that any charges against them were proved,' save the following, which are clearly found, namely : (1) that until this suit was brought they rendered no account of their stewardship to any court of this State, nor, so far as appears, to any one; (2) that in the matter of the Elliot mortgage they were guilty of a clear breach of duty ; and (3) that prior to 1897 their method, or utter lack of method, of keeping their accounts, was decidedly unbusinesslike, and exceedingly careless.

The first of these charges is not specifically insisted upon as a cause of removal; nor, upon the facts found with regard to it, do we think it can be fairly regarded as such a cause. But assuming that the three charges may be urged as grounds of removal, the question is did the trial court in view of their truth, err in refusing to remove the trustees. The question primarily before us in this case is not whether this court would remove the trustees for these causes, if the

trustees were on trial here; but it is whether the trial court, in refusing to remove them for these causes, did or did not wisely exercise the discretion which the law empowers it to exercise in such cases. In considering this question it must be borne in mind that Mr. Morgan selected the original trustees, and, in terms at least, gave to them and to their successors the power to select the trustees for all time. He reposed great confidence in the original trustees, and gave to them and to their successors, exclusively, large discretionary powers in reference to the management of the schools, in reference to the investment of the trust funds, and in reference to the expenditure of the income. For aught that appears to the contrary, the conduct of the trustees in the management of the trust was satisfactory to Mr. Morgan while he lived, and has been satisfactory to his legal representatives since his death. Then, too, the report of the committee fairly shows that the trust funds, either as to principal or income, have not suffered any loss or impairment for which the trustees are blamable; that in their stewardship of that fund they acted honestly and in good faith; that the Elliot mortgage has been paid up without loss to the trust fund; that said fund is now prudently invested and in no apparent danger of being impaired; and that since 1897 the books and accounts of the trustees have been kept with care and in a businesslike way. All these things, and others of like character, the trial court undoubtedly considered in arriving at its conclusion that the trustees should not be removed. The question whether the trustees should or should not be removed was one addressed to the sound discretion of the court; it is a question dependent upon the circumstances of this particular case, and one about which trial courts might well differ in opinion. Some of the suggestions for the guidance of trial courts, in a case like the present, are well stated in the following extract from Perry on Trusts, Vol. 1 (4th Ed.) § 276: "Nor will a trustee be removed for every violation of duty, or even breach of the trust, if the fund is in no danger of being lost. The power of removal of trustees appointed by deed

or will ought to be exercised sparingly by the courts. There must be a clear necessity for interference to save the trust property. Mere error, or even breach of trust, may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity, putting the trust in jeopardy." Substantially the same suggestions are made in *Preston* v. *Wilcox*, 38 Mich. 578, and in *Massey* v. *Stout*, 4 Del. Ch. Rep. 274.

Upon the facts appearing in this case upon this appeal, we are of opinion that the trial court did not err in refusing to remove the trustees.

There is no error.

In this opinion the other judges concurred.